UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Guidant Sales Corporation, and
Cardiac Pacemakers, Incorporated,

Plaintiffs,

v.

MEMORANDUM OPINION
AND ORDER
Civil No. 01-1638 (MJD/JGL)

Jeffrey S. George and Scott Robbins,

Defendants.

---

Robert L. Schnell, Jr., Julie Knox Chosy and C. David Flower, Faegre & Benson LLP for and on behalf of Plaintiffs.

James A. Gale, Feldman Gale & Weber and Michael A. Lindsay, Dorsey & Whitney LLP for and on behalf of Defendants.

---

Defendants Jeffrey George ("George") and Scott Robbins ("Robbins") are former sales representatives of Guidant Sales Corporation ("GSC") and Cardiac Pacemakers, Inc. ("CPI") (collectively "Guidant"). CPI is a Minnesota corporation engaged in the business of manufacturing cardiac rhythm management ("CRM") devices, and GSC is the sole distribution and sales organization for all Guidant Corporation's products.[1] Both Robbins and George have extensive experience selling CRM devices , prior to and during their employment with Guidant. When George and Robbins become employed by Guidant, they both signed confidentiality and non-compete agreements. In July 2001, George and

[1]GSC is an Indiana corporation and is a wholly-owned subsidiary of CPI. CPI, in turn, is a wholly-owned subsidiary of Guidant Corporation.



FILED NOV 1 9 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Robbins left the employ of Guidant, and began to work for St. Jude Medical S.C. Inc. ("St. Jude"), a direct competitor of CPI. Guidant brought this action seeking to enforce both George's and Robbins' confidentiality and non-compete agreements. Currently before the Court is Guidant's motion for preliminary injunctive relief. Also before the Court is Defendants' motion to dismiss for lack of personal jurisdiction and for improper venue. In the alternative, Defendants argue that this case should be transferred to Kentucky, as Defendants are residents of Kentucky, and the work they did for Guidant took place in Kentucky.

Factual Background

Robbins joined Guidant in 1995. Prior to that time, he worked for Sensor Technologies, Inc. ("Sensor"), an exclusive representative of CPI CRM products in the Kentucky area. Robbins Decl. ¶ 1, Rome Decl. ¶ 2. CPI purchased certain assets of Sensor in 1995, and Robbins accepted an offer of direct employment with CPI at that time. Id. ¶ 4. Similarly, George sold CRM devices in the Kentucky and Indiana area for seventeen years prior to his employment with Guidant, as an independent contractor for Sulzer Intermedics Inc. ("Intermedics"). George Decl. ¶ 1. In 1999, Guidant acquired Intermedics, and George became an employee of Guidant.

When George joined Guidant, he was assigned the same sales territory as Robbins, promoting and selling CRM products to physicians and hospitals in and around Louisville, Kentucky and Southern Indiana. George and Robbins contend that even though they evenly split all commissions from sales in the same territory, they each had their own clients that they dealt with on an exclusive basis.

The parties do not dispute that the marketing of CRM devices is very competitive, and given the technical complexity of the devices, sales representatives must be good salespeople and have a significant amount of technical and clinical knowledge. In fact, sales representatives are often present in the operating room when CRM devices are implanted. Lee Decl. ¶ 5. Physicians are typically viewed as the CRM sales representative's clients, because the physician is the individual that determines which CRM device will be implanted, or at least has substantial input into such decisions. Id. ¶ 8. Thus, a sales representative's personal relationship with a particular physician has great impact on the sale of CRM devices.

Given the specialized knowledge and experience of both George and Robbins, it is not surprising that when they began working for Guidant, each entered into a confidentiality and non-compete agreement. They also entered into similar agreements when they began working for St. Jude. The relevant portions of the Guidant agreement are:

> 3. NON-COMPETITION. During the terms of employment and for a period of three hundred sixty-five (365) days following the termination of employment with [CPI or Guidant] for whatever reason, Employee will not sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product in the Area of Employment.
>
> Competitive Product is defined as:
>
> any product, product line or service designed, developed, manufactured, marketed or sold by anyone other than CPI which performs similar functions or is used for the same general purposes as a CPI Product which, during the twelve (12) months immediately prior to the termination of Employee's employment with [CPI or Guidant], Employee or persons under Employee's supervision sold,

> solicited the sale of, supported the sale of, supported or supervised the implantation or other use of, or regarding which Employee or persons under Employee's supervision participated in research and development, clinical testing or engineering, or about which Employee obtained Confidential Information.
>
> CPI Product is defined as:
>
> any product, product line or service that has been acquired, designed, developed, manufactured, marketed or sold by CPI or regarding which CPI has conducted or acquired research and development. Such products include, but are not limited to, cardiac pacemakers and implantable defibrillators or products which are the functional equivalent of cardiac pacemakers or implantable defibrillators as well as leads, programmers, and other devices ancillary to cardiac pacemakers or implantable defibrillators.
>
> The term "Area of Employment" is defined as:
>
> (i) The geographical area assigned by [CPI or Guidant] to Employee or to persons under Employee's supervision within which Employee or persons under Employee's supervision sold, solicited the sale of, supported or supervised the sale or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately proceeding the termination of Employee's employment with CPI; and
>
> (ii) The Standard Metropolitan Statistical Area or Areas within which Employee or persons under Employee's supervision sold, solicited or supported the sale of, or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of Employee's employment with [CPI or Guidant].

Complaint, Exhibits A and B.

In the fall of 2000, George and Robbins informed Guidant that they were no longer satisfied with their compensation arrangement. Flower Decl., Ex. 3, Lee Dep. at 127. Negotiations continued through the spring of 2001. Id. Robbins notified Guidant that St. Jude made substantial offers to he and George. Lee Decl. ¶ 19. Guidant made a substantial counteroffer, but St. Jude came back with a bigger offer. Id. George and Robbins accepted St. Jude's offer, and began work as independent contractors for St.

Jude Medical S.C., Inc. in July 2001. Robbins Declaration ¶ 10, George Declaration ¶ 9.

Both George and Robbins state that when they joined St. Jude, their primary responsibility was to represent St. Jude's Daig Division catheter products. Robbins Decl. ¶ 11, George Decl. ¶ 10. It is Guidant's position that St. Jude intended for George and Robbins to continue to sell CRM products in the same geographical territory they had while working at Guidant. To support this assertion, Guidant has submitted a number of documents from St. Jude. For example, one such document is a spreadsheet which forecasts George's and Robbins' sale of pacemakers and implantable defibrillators. Flower Decl., Ex. 6. Another document shows that George and Robbins were to be assigned the "territory in and around Louisville" and "will need Slatterly and Theresa to stay in place and help out." Id., Ex. 7. Guidant states that Slatterly and Theresa Beatty were the St. Jude CRM sales representatives in Kentucky. Lee Dep. at 84. Guidant also submitted notes of a conference between Robbins and St. Jude on April 18, 2001 that provides "Scott has checked - 3 of his EP's [electrophysiologists] – all brady business will come our way." Id., Ex. 7. Guidant informs that "brady" is short for "bradycardia", and that brady business references pacemaker business. And, as is indicated by the Representative Agreements entered into by St. Jude and George and Robbins, both are responsible for selling and marketing Pacesetter, Inc. and Pacesetter AB Cardiac Pacing Products. Id. Exs. 12 and 13.

These Representative Agreements also indicate that both are assigned to territories encompassing counties surrounding Louisville, Kentucky and Southern Indiana, and that both receive a guaranteed commission of $425,000 for the first two years, and $375,000

for the following four years for a total aggregate sum of $2,350,000.

Guidant further alleges that since working for St. Jude, George and Robbins have continued to work in their old territory, and have assisted with St. Jude implants of CRM devices with the same clients as they called on with Guidant. In addition, Guidant asserts that in response to its motion for a preliminary injunction, Defendants did not submit any documentation showing that they were selling or sold any of the Daig catheter products.

George and Robbins conceded that since joining St. Jude, they have represented St. Jude CRM devices to physicians and customers in the Louisville area, but only to physicians and customers to which they had no or minimal contact during the last year of their employment with Guidant. George Decl. ¶ 12, Robbins Decl. ¶ 12. Guidant has also submitted evidence to demonstrate that Defendants assisted in St. Jude implants at hospitals within the territory covered by Defendants as Guidant employees, and that they continue to market CRM devices to physicians that had previously purchased Guidant CRM devices from Defendants. For example, Defendants held a dinner event for all electrophysiologists in the Louisville area, suggesting that Defendants are in fact in contact with all physicians that utilize CRM devices, not just those with which they had no or minimal contact for the last year of their Guidant employment. Julie Knox Chosy Affidavit, Ex. 1. Evidence has also been presented to show that Robbins and George may be contacting each others' clients, in an attempt to evade the specifics of the Guidant non-compete agreements. For example, Robbins contacted Dr. Kishor Vora, and told Vora's staff that he "would be covering for Jeff [George] while he is in the penalty box."

Nina Scott Decl. ¶ 4-5.

In its Complaint, Guidant alleges that George and Robbins have breached the Guidant non-compete agreements by selling and marketing, directly and indirectly, the competitive products defined in the agreement. Guidant has also asserted a claim of misappropriation of trade secrets against Defendants, for allegedly disseminating to St. Jude customer and pricing information not generally known or readily ascertainable. In its present motion for preliminary injunctive relief, Guidant asks that George and Robbins be enjoined from selling and marketing, directly or indirectly, any competing cardiac pacemaker, defibrillator, or accessory to any of said products, relating to any customer whom they called on while employed by Guidant, or relating to the territory in which they sold products while employed by Guidant.

Personal Jurisdiction

Defendants first argue that this case should be dismissed as this Court does not have personal jurisdiction over them. They argue that they are Kentucky residents, the physicians and hospitals they called on are in Kentucky and Indiana, and that their employer, GSC, is an Indiana corporation. They further assert they had insufficient contacts with Minnesota.

Federal courts have been instructed to use a two-step inquiry when determining whether it has jurisdiction over a non-resident party: (1) whether the facts presented satisfy the forum state's long-arm statute, and (2) whether the non-resident has minimum contacts with the forum state, so that the court's exercise of jurisdiction would be fair and in accordance with due process." Soo Line R. Co. v. Hawker Siddeley Canada, Inc., 950

F.2d 526, 528 (8th Cir. 1991). The inquiry collapses into a single question of whether the exercise of personal jurisdiction comports with due process, when a state construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the due process clause. Bell Paper Box, Inc. v. U.S. Kinds, Inc., 22 F.3d 816, 818 (8th Cir. 1994). Minnesota has construed its long-arm statute to have the maximum extraterritorial effect allowed under the due process clause. Valspar Corp. v. Lukken Color Corp., 495 N.W.2d 408, 410-411 (Minn. 1992).

"Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause." Dominium Austin Partners LLC v. Emerson, 248 F.3d 720, 726 (8th Cir. 2001)(citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 n. 14 (1985); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). Forum selection clauses will be upheld, unless it is invalid, or enforcement would be unreasonable and unjust. Id. The Defendants acknowledge that the Guidant non-compete agreements had a forum selection clause, but ask that the Court find such clause insufficient for two reasons: it does not apply to Guidant's misappropriation claim; and the clause is unenforceable.

First, the Court finds no merit to the argument that the forum selection does not apply to Guidant's misappropriation claim. The agreements at issue include confidentiality provisions. Because the forum selection applies to "the interpretation or enforcement of this Agreement. . .", such clause applies to confidentiality issues as well as non-compete issues. Additionally, as will be discussed in further detail below, the Court finds that the Guidant Non-Compete Agreements at issue in this case are valid and

enforceable. Accordingly, the Court finds that the forum selection clauses contained in both Agreements are dispositive of the personal jurisdiction issue, as well as the venue issue.

Failure to Sufficiently Plead Diversity of Citizenship

Defendants argue that Guidant has failed to properly plead citizenship in the Complaint. Without properly pleading diversity of citizenship, as compared to residence, the Rules of Civil Procedure require that the Complaint be dismissed.

While technically correct, the Court notes that Defendants do not dispute that they are citizens, as well as residents, of Kentucky. Accordingly, the Court will allow Guidant to amend their Complaint to allege that Defendants are citizens of Kentucky.

Preliminary Injunction

By its motion for injunctive relief, Guidant seeks to enjoin Defendants from having any involvement in the sale of defined competing products in the defined territory for a period of one year from the date they became employed by St. Jude. The Eighth Circuit has established that the following factors are to be used when considering a motion for preliminary injunctive relief:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

Dataphase Sys., Inc. v. C. L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); accord Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1090 (D. Minn. 1981) aff'd, 684 F.2d 565

(8th Cir. 1982).

A. Likelihood of Success on the Merits

Guidant asserts that this factor weighs in favor of the injunctive relief sought because the Non-Compete Agreements at issue are enforceable, and that evidence has been submitted to the Court to demonstrate that Defendants have breached such Agreements.

In Minnesota, courts look upon non-competition agreements with disfavor and scrutinize them carefully because they are agreements in partial restraint of trade. National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982). The reasonableness of such an agreement is for the Court.

> The test is whether the restraint is necessary for the protection of the business or good will of an employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends. Bennett v. Storz Broadcasting Co., 270 Minn. 525, 534, 134 N.W.2d 892, 899 (1965).

1. Validity of Robbins' Agreement

Defendants argue that the Non-Compete Agreement signed by Robbins was between CPI and Robbins. When GSC was created in 1996 as the entity responsible for distributing Guidant Corporation's products, Robbins became a GSC employee, but the Non-Compete Agreement was not assigned to GSC. Therefore, Defendants argue that the one-year non-compete period in the Non-Compete Agreement was triggered by the termination of Robbins' employment with CPI in 1996.

In response, Guidant asserts that when CPI created GSC as a wholly-owned subsidiary, Robbins' employment was not terminated, rather his employment was transferred and assigned to GSC. Rome Decl. ¶ 5. Such transfer and assignment in no way changed Robbins' employment; he continued to sell the same products in the same territory under the same name. Id. ¶ 6. In addition, Robbins' Non-Compete Agreement defines CPI as "Cardiac Pacemakers, Inc. and all of its parent, subsidiary or affiliated corporations and the operating divisions thereof."

Defendants nonetheless argue that Minnesota case law does not permit a non-compete agreement to be assigned, citing to Saliterman v. Finney, 361 N.W.2d 175 (Minn. Ct. App. 1985). Saliterman holds that a non-compete agreement may be assigned "ancillary to the sale of a business to protect the goodwill of that business." Contrary to Defendants' assertions, it does not limit its holding to the sale of a business. As Guidant points out, the formation of GSC to handle the distribution services amounted to a simple corporate name change, and there is no basis for not allowing the non-compete agreements to be assigned in such circumstances.

The Court thus finds that Robbins' Non-Compete Agreement remained in full force and effect until he resigned in July 2001. See, Cardiac Pacemakers, Inc. v. St. Jude Medical, File No. 62-C0097-11228 (Minn. Dist. Ct. Ramsey Co., May 20, 1998)(Flower Decl., Ex. 28)(rejecting similar argument). See also, Automated Technologies, Inc. v. Eller, 160 F.Supp. 2d 915, 924 (D. Ill. 2001)(finding that generally, courts permit assignment of restrictive covenants to a corporate acquirer).

2. Validity of George's Agreement

Defendants also argue that George's Non-Compete Agreement is an invalid contract of adhesion. George argues that prior to becoming an employee of GSC, he was an independent contractor for Intermedics, selling CRM products. In 1999, when Guidant purchased Intermedics, Guidant offered Intermedics' independent contractors the opportunity to become Guidant employees. They were told that they could continue as independent contractors, but that they would not receive perquisites given to Guidant employees. (referred to as the "Pillow and Bat Strategy"). George argues that under these circumstances, he was compelled to sign the Non-Compete Agreement and become a Guidant employee.

Allegations of economic duress do not render the Non-Compete Agreement invalid, however, because Minnesota courts do not recognize this defense in disputes concerning contract law. Johnson v. Hubbard Broadcasting, 940 F. Supp. 1447, 1456 (D. Minn. 1996). In addition, the authority relating to contracts of adhesion have no application to an agreement between private parties. See Schlobohm v. Spa Petite, Inc., 326 N.W.2d 920, 924-25 (Minn. 1982)(an adhesion contract is that which is drafted by a business enterprise and forced upon unwilling and often unknowing public for services that cannot readily be obtained elsewhere).

3. Reasonableness of Restrictions

Defendants argue that the Non-Compete Agreements are far broader than necessary. Defendants argue that the Non-Compete Agreements at issue are defined by geographical territories. However, to protect Guidant's goodwill, the non-compete

restriction need only be limited to the physicians and hospitals that each particular defendant had developed professional relationships with as Guidant employees. Related to this issue, Defendants also argue that Guidant has no legitimate interest in Robbins' and George's pre-existing relationships with physicians and hospitals. They state that prior to becoming GSC employees, they both sold CRM products for a number of years and developed relationships during that time.

Territorial restrictions in non-compete agreements have been upheld. See eg., Guidant Sales Corp. v. Niebur, Memorandum Opinion and Order at 12, Civ. No. 01-1772(DWF/AJB)(D. Minn. 2001); Lexis-Nexis v. Beer, 41 F.Supp. 2d 950, 958 (D. Minn. 1999). There is also support for Defendants' position that a restriction limited to prior customers is reasonable. See eg., Davies & Davies Agency, Inc. v. Davies, 298 N.W.2d 127 (Minn. 1980). However, the Court finds that the unique circumstances of this case support the territorial restriction contained in the Guidant Non-Compete Agreement.

First, the Court recognizes that although George and Robbins had distinctive clients, it is also clear that each nonetheless benefitted from the others' sales and the relationship each established with physicians and hospitals. As independent contractors for St. Jude, they still stand to benefit from the client relationships established by the other. There is evidence in the record to support Guidant's assertion that George and Robbins can simply "flip" their clients; George working with Robbins' clients and visa versa, each taking advantage of the client relationship developed by the other. See Scott Decl. ¶¶ 4-5. There are indications that they have done just that.

Second, there is no basis upon which to separate the good will generated by Robbins and George prior to joining Guidant, and the goodwill attributable to Guidant's products. As previously recognized in this district, "[d]ue to the heavy reliance of implanting physicians on the skill and advice of pacemaker sales representatives, the sales representative naturally becomes closely identified with the manufacturer. A symbiotic relationship develops between sales representative and manufacturer." Gibbons v. Medtronic, 527 F. Supp. 1085, 1091 (D. Minn. 1981) aff'd, 684 F.2d 565 (8th Cir. 1982). Each provides enhancements to the other. Id. In this case, although Robbins did not become a GSC employee until 1995, the CRM products he sold prior thereto were nonetheless CPI products. Therefore, any goodwill he generated prior to becoming a GSC employee are interdependent on CPI products. Similarly, although George sold an Intermedics product prior to joining GSC, Guidant nonetheless purchased Intermedics, and is entitled to the benefit of the goodwill established for that product.

Based on the unique circumstances surrounding the products at issue, and the specific sales relationship between George and Robbins, the Court finds that the restrictions contained in the Guidant Non-Compete Agreements are reasonable.[2]

4. Has a Breach been Established

Finally, Defendants assert that Guidant has failed to show that either Robbins or George breached their Guidant Non-Compete Agreements. It is their position that the evidence submitted by Guidant is hearsay and speculative. Guidant, on the other hand,

---

[2]The Court also finds significant the fact that the Representative Agreements entered into between George and Robbins and St. Jude include similar territorial restrictions.

states the evidence shows a breach. Both George and Robbins concede in their declarations that they are selling and marketing St. Jude CRM products in the Louisville area.

Based on the evidence described previously in the memorandum, and based on Defendants' concession that they have continued to sell and market St. Jude CRM products in the Louisville are, the Court finds that Guidant has met its burden of showing a likelihood of success on the merits of its claim that Defendants breached the valid Guidant Non-Compete Agreements.

B. Irreparable Harm

Irreparable harm may be inferred from the breach of a restrictive covenant in an employment contract. Overholt v. Crop Insurance Service Company, Inc. v. Bredeson, 437 N.W.3d 698, 701 (Minn. Ct. App. 1989)(citation omitted). Based on the unique product at issue in this case, the competitive market for CRM products, and the expertise required of sales representatives for CRM products, the Court finds that Guidant will suffer irreparable harm if the injunction is not granted, as it will likely lose valuable business relationships in a limited market.

C. Balance of Harms

Guidant argues that through this motion, it seeks to maintain the status quo and prevent irreparable harm. On the other hand, if the injunction is granted, George and Robbins have guaranteed salaries pursuant to their respective Representative Agreements with St. Jude whether or not they sell any product. The Court finds that the balance of harms weighs in favor of the requested injunctive relief.

D. Public Interest

Public interest favors competition. St. Jude Medical, Inc. v. Intermedics, Inc., 611 F.Supp. 96, 101 (D. Minn. 1985). Public interest also favors enforcing valid agreements. Accordingly, this factor neither weighs in favor of or against injunctive relief.

Based on the above, the Court finds that Guidant has established that injunctive relief is warranted.

IT IS HEREBY ORDERED THAT Guidant's motion for a preliminary injunction is GRANTED. Defendants Jeffrey S. George and Scott Robbins are enjoined from directly or indirectly selling, soliciting the sale of, supporting the sale of, supporting or supervising the sale or implantation or other use of, or otherwise having any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any cardiac pacemaker, implantable defibrillator, or any product ancillary to a pacemaker or implantable defibrillator to any physician, hospital administrator, hospital, clinic, or any other actual or potential customer within the geographic territory for whom either defendant was responsible, directly or indirectly, for selling or supporting the sale of Guidant products (specifically including any such customer for whom either defendant was entitled to share of commission) as of July 18, 2001. This injunction shall remain in effect until the earlier of one year from the date of this order or entry of a final judgment in this action. This order is binding upon the defendants as well as their affiliates, successors and assigns, and their agents, servants, employees, representatives, attorneys and persons in active concert or participation with them.

IT IS FURTHER ORDERED that within 72 hours after receiving this Order, Guidant shall post a bond in the amount of $250,000. In lieu of a bond, Guidant may post cash or its equivalent with the Clerk of Court.

Date: Nov. 19, 2001

Michael J. Davis
United States District Court